IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 13, 2014

**CARL J. WAGNER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-A-305      Steve R. Dozier, Judge**

---

**No. M2014-01086-CCA-R3-PC - Filed February 20, 2015**

---

A Davidson County jury convicted the Petitioner, Carl J. Wagner, of first degree felony murder, second degree murder, and especially aggravated burglary.  The trial court imposed a life sentence.  The Petitioner appealed, and this Court affirmed the judgment for the second degree murder conviction and reversed the judgments for the first degree felony murder and especially aggravated kidnaping convictions.  *State v. Carl J. Wagner*, No. M2010-00992-CCA-R3-CD, 2011 WL 2893098, at *1 (Tenn. Crim. App., at Nashville, July 20, 2011), *perm. app. granted* (Tenn. Jan. 11, 2012).  Our Supreme Court reinstated the judgments for all three convictions.  *State v. Wagner*, 382 S.W.3d 289, 291 (Tenn. 2012).  The Petitioner subsequently filed a petition for post-conviction relief, in which he alleged that he was entitled to relief on multiple grounds, including that he had received the ineffective assistance of counsel.  The post-conviction court dismissed the petition after a hearing.  After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Carl J. Wagner.

Herbert H. Slatery, III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Victor S. Johnson, III, District Attorney General; Rachel M. Sobrero, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

This case arises from the Petitioner shooting the victim in an apartment complex in Nashville, Tennessee. Our Supreme Court summarized the facts of the case as follows:

On August 27, 2008, [the Petitioner], shot nineteen-year-old Adriel Charles Powell in the laundry room of a Nashville apartment complex located at 1601 Herman Street. The State charged the [Petitioner] with premeditated first degree murder, first degree murder committed in the perpetration of, or attempt to perpetrate, robbery, and especially aggravated robbery. The prosecution's theory at trial was that the shooting occurred during a drug deal as the [Petitioner] robbed the victim of a backpack containing narcotics.

Officer William McKay of the Metropolitan Nashville Police Department ("Metro") arrived at the scene of the shooting shortly after a 3:25 p.m. report of "shots fired." Four bystanders in an outdoor courtyard told Officer McKay of a "dead person in the laundry room." Another bystander told Officer McKay of "a guy [inside the laundry room] with his brains out." As he approached the laundry room, Officer McKay noticed a bullet hole in the shattered window next to the door. Because the door was closed and locked, Officer McKay did not enter the laundry room, but he saw the victim, whom he described as obviously dead, lying on the floor just inside the door. After securing the scene, Officer McKay called for homicide detectives and remained at the scene until other officers arrived.

Metro Detective Michael Moss was on his way to the scene of the shooting when he was redirected to the emergency room of Vanderbilt Children's Hospital to investigate a report of a person with gunshot wounds, later identified as the [Petitioner]. When he arrived, Detective Moss spoke briefly with Thalis Smith, who had driven the [Petitioner] to the hospital and assisted him into the emergency room. Detective Moss then interviewed the [Petitioner] who said that he had been standing in a grassy area of the apartment complex when he heard gunshots and fled. Realizing that he had been shot, the [Petitioner] ran to Mr. Smith, who helped him into a vehicle and drove him to the hospital. According to Detective Moss, the [Petitioner] said he knew Mr. Smith prior to the shooting and described Mr. Smith as "my boy," but the [Petitioner] denied any involvement in or knowledge of the shooting.

2

Before he left the hospital, Detective Moss collected several items from the [Petitioner's] belongings, including money totaling $51.25, a holster, Nike tennis shoes, clothing, a lighter, and a bag of "green plant material," which scientific testing later identified as marijuana.

Detective Moss also arranged for Mr. Smith to return to the scene of the shooting, where Metro Detective James Capps, the lead detective on the case, interviewed him. According to Detective Capps, Mr. Smith was "very anxious" during the interview and repeatedly denied any knowledge of the shooting. Mr. Smith said he "didn't want to be there" and just happened to be standing on the street smoking a cigarette when the [Petitioner] ran up and asked for help. Seeing the [Petitioner] had been shot, Mr. Smith drove him to the hospital. Mr. Smith said nothing about knowing the [Petitioner] prior to the shooting.

As detectives conducted interviews, Metro Sergeant Danny Orr and Metro Crime Scene Investigator Felicia Evans collected evidence and prepared detailed diagrams documenting the location of the evidence found in the laundry room, the outdoor courtyard, and the parking lot of the apartment complex. Investigator Evans swabbed thirteen distinct "reddish-brown stains" at the scene, which DNA analysis later confirmed were bloodstains. The first bloodstain, found on a vehicle in the parking lot, the second and third bloodstains, found on the ground near the vehicle, a fourth bloodstain, found on top of the shattered window glass in front of the laundry room door, and a fifth bloodstain, found on the interior of the laundry room door, all matched the [Petitioner's] DNA. A sixth bloodstain, found on the interior laundry room door frame, a seventh bloodstain, found on the interior wall of the laundry room, and an eighth bloodstain, found on the circular metal plate surrounding the interior laundry room door knob, all matched the victim's DNA.

Five other bloodstains, numbered nine through thirteen at trial, were found on the railing next to the walkway outside the laundry room. The bloodstains numbered nine through twelve at trial matched the [Petitioner's] DNA and were drop-pattern stains. The bloodstain numbered thirteen at trial matched the victim's DNA and was described as a transfer pattern stain, meaning the blood had been transferred from fabric onto the railing.

Investigators also recovered a pair of Nike flip flops outside the laundry room - finding one sandal on the courtyard walkway and the other in the parking lot near the vehicle where the [Petitioner's] blood had been found.

3

Additionally, investigators found three nine-millimeter cartridge casings in the courtyard - two on the walkway and one in the bushes in front of the laundry room. Investigators also recovered a nine-millimeter magazine with six unspent Winchester cartridges next to the walkway in the courtyard. A copper bullet jacket fragment was found outside as well, near the shattered glass of the shot-out window.

Inside the laundry room, next to the victim's body, investigators found two Federal .45 caliber cartridge casings. A baseball cap located near the victim's body was marked by a bullet hole, and beneath the cap investigators found an intact .45 caliber bullet and a lead fragment, likely from a bullet but lacking exterior identifying characteristics. Investigators also recovered bullet fragments from the wooden laundry room door frame.

Special Agent Steve Scott of the Tennessee Bureau of Investigation ("TBI") examined the ballistics evidence and testified that the two .45 caliber cartridge casings and the intact bullet found beneath the cap were fired from the same .45 caliber weapon. Agent Scott determined that the bullet, bullet jacket, and bullet fragment recovered from the victim's body also had been fired from the same .45 caliber weapon.

Agent Scott testified that the three nine-millimeter cartridge casings were fired from the same nine-millimeter weapon. With respect to the nine-millimeter magazine found outside the laundry room, Agent Scott opined that it was designed for use with a Smith and Wesson nine-millimeter semi-automatic pistol of the Sigma series. Agent Scott further opined that the copper bullet jacket fragment and the bullet fragments recovered from the laundry room door frame had rifling consistent with that type of Smith and Wesson handgun.

Despite the lack of exterior identifying characteristics, Agent Scott testified that the fragment found beneath the cap was a copper-washed lead fragment "that is almost exclusively seen in twenty-two caliber ammunition." According to Agent Scott, the bullet that passed through the window next to the laundry room door had been fired toward the courtyard from a gun inside the laundry room, while the bullet recovered from the laundry room door frame had been fired toward the laundry room from a gun in the courtyard.

At approximately 7:25 p.m. on the day of the shooting, Mr. Smith, the victim, and the [Petitioner] were tested for gunshot residue. TBI Special

4

Agent Laura Hodge testified that Mr. Smith tested negative; the victim tested positive; and the [Petitioner] tested inconclusive. Agent Hodge explained that gunshot residue consists of antimony, barium, and lead, and that an inconclusive test result indicates the presence of one or more of those elements, but in concentrations not consistent with gunshot residue. Because gunshot residue is "very fragile evidence," deposited "just on the surface of an individual's hands" and can be easily rubbed off or washed away, an inconclusive result does not rule out the possibility that the person tested fired a gun. According to Agent Hodge, the likelihood of finding gunshot residue is greater if the testing occurs soon after the firing, and she also explained that semi-automatic handguns discharge gunshot residue down range, away from the shooter, leaving less residue than other handguns.

The day after the shooting, August 28, 2008, Detective Capps interviewed the [Petitioner] at Vanderbilt Hospital, where he remained for treatment of his injuries. The jury heard an audio recording of the interview, and the State also introduced a transcript of the interview as an exhibit. The [Petitioner] initially denied any involvement in the shooting, telling Detective Capps that he lived in Clarksville and had been at the Herman Street apartments visiting a female friend, "Rita," and was shot while standing in the courtyard outside the laundry room. However, as the interview progressed, the [Petitioner] changed his story. While he initially claimed that he used the holster found among his belongings to store coins and other items, the [Petitioner] eventually admitted that he had carried a .45 caliber semi-automatic handgun in the holster on the day of the shooting. The [Petitioner] said he purchased the weapon some years earlier at "Grandpa's," a gun shop in Clarksville. The [Petitioner] admitted that he frequently smoked marijuana, explaining that he had "picked up the habit like bad" while serving in the military. The [Petitioner] claimed that he had bought expensive, premium-quality marijuana in Clarksville and had brought it with him to Nashville on the day of the shooting, but he had been reluctant to share it with Mr. Smith, who came with him to Nashville, or Rita. When he learned from Rita that he could buy drugs at the laundry room, he went there with approximately forty dollars, intending to buy less-expensive marijuana to share with his friends.

The [Petitioner] said he met the victim and a second man outside the laundry room. According to the [Petitioner], the victim was carrying "a bag on his back," and the [Petitioner] believed the bag contained drugs. After opening the locked laundry room door with a key, the victim entered, followed

5

by the [Petitioner], who was followed by the second man. The victim walked into a separate room near the back of the laundry room with the backpack, while the [Petitioner] and the second man remained near the door - the only means of entering and exiting the laundry room. The [Petitioner] sat on a "ledge" to the right of the door, while the second man stood nearby. They had waited only a few minutes when, according to the [Petitioner], the second man suddenly began shooting at him and then ran out the door into the courtyard. The second man continued shooting, and the [Petitioner] fired back, shooting through the window next to the door at least once.

When the shooting began, the [Petitioner] saw the victim run from the room at the rear of the laundry room toward the door. As the victim approached the door, the [Petitioner] shot him, but the victim continued toward the door, so the [Petitioner] shot the victim a second time. The victim then fell to the floor in front of the door, and the [Petitioner] fled the scene, losing his Nike flip flops as he ran.

Although the [Petitioner] could not recall seeing the victim with a gun and said the victim did not threaten him, the [Petitioner] said he shot the victim because he feared the victim would shoot him. The [Petitioner] saw the second man run away from the courtyard, but the [Petitioner] did not know whether the second man had been shot. The [Petitioner] repeatedly said the victim had a backpack. The [Petitioner] was not asked directly whether he took the victim's backpack. When asked whether he and the victim had a physical altercation that would explain the victim's torn shirt, the [Petitioner] denied touching the victim and said he fled the scene immediately after shooting the victim, stating on one occasion that he fled the scene before the victim fell to the floor. The [Petitioner] also denied purchasing or stealing marijuana from the victim and explained that the marijuana found among his belongings had been purchased in Clarksville before he came to Nashville. The [Petitioner] said that he was "just trying to get some weed," but the second man "was trying to kill [him]." Although the [Petitioner] remembered Rita, Mr. Smith, and another man driving him to the hospital and also recalled the two men physically carrying him into the emergency room, he could not remember where he dropped the gun used in the shooting. He suggested that Mr. Smith could possibly locate the gun, however.

Detective Capps testified that investigators were unable to locate anyone other than the [Petitioner] willing to admit to firsthand knowledge of the shooting. Rita refused to cooperate in the investigation, and the police

6

were unable to locate Mr. Smith, despite searching for him in the vicinity of both Clarksville, Tennessee, and Oak Grove, Kentucky.

Still photographs obtained from video surveillance at Vanderbilt Children's Hospital confirmed the [Petitioner's] statement that Mr. Smith and another man, whom investigators were never able to identify, physically carried the [Petitioner] into the emergency room.

Investigators recovered neither the gun the [Petitioner] used in the shooting nor the victim's backpack containing drugs. However, investigators confirmed the [Petitioner's] statement that the [Petitioner] was the registered owner of a .45 caliber semi-automatic handgun that he had purchased from "Grandpa's" gun shop in Clarksville.

Dr. Bruce Levy, Chief Medical Examiner for the State of Tennessee and Medical Examiner for Davidson County, performed the victim's autopsy on August 28, 2008. Dr. Levy ruled the victim's death a homicide caused by at least two gunshots. Dr. Levy opined that a single bullet likely entered the left side of the victim's neck, exited on the right side, re-entered the victim's shoulder, and exited the top part of his right arm. Dr. Levy opined that these wounds did not penetrate the victim's spinal cord or impact any significant blood vessels. However, Dr. Levy said the other bullet that entered the left side of the victim's head would have produced "immediate unconsciousness rapidly progressing to death . . . within a m[a]tter of . . . a few minutes at most."

. . . .

Based on the evidence, the jury convicted the [Petitioner] of first degree murder committed in the perpetration of, or attempt to perpetrate, robbery ("felony murder"). The jury also convicted the [Petitioner] of especially aggravated robbery and second degree murder - a lesser-included offense of the charge of premeditated first degree murder. The trial court merged the second degree murder conviction with the felony murder conviction and imposed a life sentence by operation of law for the felony murder conviction and a twenty-two year concurrent sentence for the especially aggravated robbery conviction.

*Wagner*, 382 S.W.3d at 291-96 (footnotes omitted). On direct appeal, "the Court of Criminal Appeals held the evidence insufficient to support the [Petitioner's] conviction of especially

7

aggravated robbery. Because it found the proof of especially aggravated robbery insufficient, the Court of Criminal Appeals stated that the evidence was 'ipso facto' insufficient to support the [Petitioner's] conviction of felony murder." *Id.* at 296 (citations omitted). Our Supreme Court concluded that the evidence was sufficient to support the Petitioner's convictions of especially aggravated robbery and felony murder and reinstated the judgments of the trial court. *Id.* at 300.

## B. Post-Conviction Hearing

The Petitioner filed a petition, *pro se*, for post-conviction relief. Post-conviction counsel was appointed and he filed an amended petition on the Petitioner's behalf. The amended petition alleged that the Petitioner received the ineffective assistance of counsel because trial counsel ("Counsel") failed to "mount a credible defense." The Petitioner further alleged that Counsel failed to communicate with him, failed to call necessary expert witnesses, and failed to properly represent him during sentencing. The post-conviction court held an evidentiary hearing, where the parties presented the following evidence:

The Petitioner testified that he was serving a life sentence. He stated that he retained Counsel before his jury trial and that he and Counsel met three or four times to discuss the Petitioner's case. The Petitioner agreed that the State offered him a plea bargain that Counsel conveyed to him by mail. The Petitioner rejected the offer. Counsel explained to the Petitioner before his trial that the defense's theory would be self-defense. The Petitioner agreed with this defense theory. The Petitioner stated that Counsel did not call any witnesses for him at trial. The Petitioner testified that the State's expert witnesses should have been called by Counsel to testify. Counsel did not hire any ballistics experts or other investigators to rebut the State's case.

The Petitioner stated that the State's theory was that he had taken a backpack full of the victim's things, amounting to a robbery and thus making him guilty of felony murder. The Petitioner stated that there was no proof presented at trial that he had stolen the backpack. The Petitioner testified that the evidence used to convict him also could have been used to "help [him] out" but that the evidence was not presented to the jury in a light favorable to the Petitioner.

The Petitioner agreed that he had two bullet wounds as a result of the crime. He agreed that the victim also had two bullet wounds, one of which was a .45 caliber bullet. The Petitioner agreed that he had a .45 caliber gun, but stated that the victim's bullet wound "had to" have come from a third person. The Petitioner could not remember if Counsel brought this out in front of the jury.

The Petitioner testified that Counsel presented several alternative theories about how the victim died during closing argument. The Petitioner stated that the "version of events" to his recollection was as follows:

> Basically I was in the laundry room sitting on the ledge to the right side of – it's a ledge to the – there is a door coming in this way. There is a right – ledge to the right side. I was sitting on the ledge.

> The individual at the door pulled his gun out and shot me. The tracks of – the bullets inside my body can prove that I was shot sitting at that [ledge]. I got shot again on my left shoulder. I really can't remember exactly where I was at when I got shot. But everything occurred inside this laundry.

The Petitioner testified that, to his knowledge, the "trajectory of the bullet" that went into him was "consistent with somebody standing at the door and shooting [him]." The Petitioner did not recall if Counsel presented this in front of the jury. The Petitioner did not know if the victim's backpack was ever recovered, or if there was ever marijuana in the backpack. He agreed that a sandwich bag of marijuana was found on his person at the hospital, but he stated that no fingerprint analysis was done on the sandwich bag to prove his claim that the marijuana was his.

The Petitioner testified that Counsel did not adequately communicate with him or go over the case in sufficient detail. The Petitioner stated that Counsel should have presented the facts and used the State's evidence in his favor. He stated that the victim's DNA was not found on him, and Counsel did not "drive home" to the jury the fact that he could not be placed anywhere close to the victim because the victim's blood was not found on him.

The Petitioner testified that the victim's girlfriend had seen the third individual, and she was subpoenaed as a witness. The Petitioner could not recall if she showed up for trial or whether "she actually took the stand." He also reiterated that the gunshot residue test revealed that the victim had fired a weapon but did not show the same for the Petitioner. He did not know if that was something the jury heard or considered.

On cross-examination, the Petitioner stated that the State's evidence that should have been used in his favor was the gunshot residue test and the crime scene photographs. The Petitioner agreed that there were no other witnesses to the incident other than himself and the third individual. He stated that he decided not to testify based on Counsel's guidance.

Counsel testified that he was a licensed attorney for twenty-five years and that ninety percent of his practice was dedicated to criminal defense work. He estimated that he had

9

participated in almost 100 jury trials at the time of the Petitioner's trial, including trials for first degree murder. Counsel agreed that he represented the Petitioner at his preliminary hearing and that he visited the Petitioner in jail five or six times. They discussed Counsel's "assessment of the evidence," as well as possible defenses and whether the Petitioner wanted to testify. Counsel stated that the Petitioner's statement given at the hospital "implicated" him in the crime when, about halfway through the Petitioner's statement, the Petitioner said words to the effect that if he was being shot at he was going to shoot back.

Counsel recalled that the Petitioner "early on" decided not to testify but could not recall his reasons. Counsel said that the Petitioner was "pretty consistent" throughout their discussions that he did not want to testify. Counsel stated that the defense theory he presented throughout the trial was self-defense and that "someone pulled a gun on [the Petitioner] during a drug deal and they started shooting at him. And [the Petitioner's] response was to shoot back in self-defense." This was communicated to the jury through Counsel's cross-examination of witnesses to the extent that Counsel could elicit favorable testimony from the witnesses. Counsel did not cross-examine the witnesses he felt would not provide favorable testimony. Counsel stated, "every question I would have asked [the State's witness] would have been intended to be in [the Petitioner's] favor."

On cross-examination, Counsel agreed that he did not hire an investigator for this case. Counsel viewed the crime scene and spoke to all the witnesses listed by the State. Counsel agreed that he did not hire any independent experts to testify to the ballistics or DNA evidence. He stated that the evidence "could have gone [the Petitioner's] way or it could have gone the State's way. It went the State's way." He stated that the Petitioner had given a statement to police that he acted in self-defense, and "the witnesses for the State didn't really impeach that."

Counsel could not recall the facts or the Petitioner's statements about the victim's backpack. He agreed that the backpack was a pivotal fact at trial because, "without the fact of the backpack, there is no felony murder[.]" Counsel stated that in closing arguments he argued that if the Petitioner took the backpack, it was at most a misdemeanor theft.

Counsel reiterated that he did not tell the Petitioner whether or not to testify, but he advised the Petitioner that he "didn't think he would make a good witness" because "his story that he gave the police wasn't good" and there were "nuggets" in it that the State would exploit, including the Petitioner's statement at the hospital. Counsel filed a motion to suppress the Petitioner's statement made at the hospital. Counsel stated that he later withdrew the motion because he could not provide an argument that the Petitioner was "in custody" when he gave the statement at the hospital. He stated that the Petitioner seemed to understand that, because the interview at the hospital was not a "custodial interrogation," his

10

statement would not be suppressed. Counsel agreed that without the Petitioner's statement, the State would not have been able to link him to the crimes.

On redirect-examination, Counsel stated that he felt it was more effective to cross-examine the State's witnesses and experts than call them to testify on the Petitioner's behalf, because studies show that "juries for some reason[] believe the State's experts a little more than they do defense experts." Counsel believed that he could introduce the self-defense theory through the State's witnesses which would be more effective in persuading the jury that the Petitioner acted in self-defense.

Based upon this testimony, the post-conviction court denied post-conviction relief. The Petitioner appeals this judgment.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it failed to find that Counsel was ineffective. The Petitioner contends that Counsel's "failure to call expert witnesses to rebut the State's investigators or to present an alternative theory amounts to ineffective assistance of counsel" and prejudiced the outcome of the Petitioner's trial. The State responds that the Petitioner has failed to prove that Counsel's trial strategy constituted ineffective assistance of counsel. The State contends that Counsel developed the theory of self-defense through cross-examination of the State's witnesses and argued several alternatives to the State's theory during closing arguments. The State further contends that the Petitioner has neither provided any proof of his alternative theory nor did he call any witnesses to testify at post-conviction proceedings. Thus, the State contends that the Petitioner has failed to meet his burden and was properly denied relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572,

11

578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462.

Finally, we note that a defendant in a criminal case is not entitled to perfect

12

representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In this case, the post-conviction court found that Counsel's testimony about his strategy for trial – to cross-examine the State's witnesses rather than call them to testify on behalf of the Petitioner – was credible and sufficiently tailored to establish the theory of self-defense. The post-conviction court also noted that the Petitioner had not presented any proof that the verdict would have been different if the State's witnesses had testified on his behalf. The court therefore held that the Petitioner had not demonstrated any prejudice. The post-conviction court further found that Counsel adequately prepared for the Petitioner's trial and discussed with the Petitioner his trial strategy, the evidence against him, including the State's expert's reports, as well as sentencing and the Petitioner's decision not to testify. The post-conviction court held that the Petitioner had not proven any of his allegations that Counsel was ineffective.

We conclude that the evidence presented at the hearing supports the post-conviction court's finding that the Petitioner did not prove by clear and convincing evidence that Counsel's representation was deficient. Counsel's strategy, to cross-examine the State's witnesses to develop his theory of self-defense, rather than to call the witnesses on behalf of the Petitioner, was an informed decision based on Counsel's experience in criminal defense work that juries tended to believe the State's experts, rather than those called to testify on behalf of the defense. Counsel has discretion in conducting the defense and is entitled to use his best judgment in matters of trial strategy or tactics. *See McBee v. State*, 655 S.W.2d 191,

193 (Tenn. Crim. App. 1983). We further conclude that Counsel sufficiently prepared for trial through multiple meetings with the Petitioner and their discussions about Counsel's strategy and the theory of self-defense which Counsel argued in front of the jury. The Petitioner has failed to show that Counsel's services fell outside the range of competence normally required of attorneys in criminal trials. *See Baxter*, 523 S.W.2d at 936. Having failed to show the first prong of the *Strickland* standard, the Petitioner has not met his burden of showing that he is entitled to post-conviction relief based upon Counsel's performance. *Id*.

Furthermore, we conclude that the Petitioner did not prove that he was prejudiced by Counsel's representation of him. The Petitioner did not present any evidence at the post-conviction hearing to demonstrate that had Counsel called the State's witnesses to testify on his behalf, the outcome of his trial would have been different. The Petitioner also failed to present any evidence linking a third individual to this crime or any evidence that the Petitioner's alternative theory is credible. Without such evidence, the Petitioner has failed to meet his burden of proof. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding that "[w]hen a [petitioner] contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the [petitioner] at the evidentiary hearing.") Accordingly, we hold that the evidence did not preponderate against the post-conviction court's conclusion that Counsel was not ineffective. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE